NOT DESIGNATED FOR PUBLICATION

No. 122,292

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of
N.O., E.O., and Z.Z.,
Minor Children.

MEMORANDUM OPINION

Appeal from Seward District Court; LINDA P. GILMORE, judge. Opinion filed May 29, 2020.
Affirmed.

*Kelly Premer Chavez*, of Tahirkheli & Premer-Chavez Law Office, LLC, of Liberal, for appellant
natural mother.

*Lane L. Frymire*, of Yoxall, Antrim & Frymire, LLP, of Liberal, for appellee State of Kansas.

Before ARNOLD-BURGER, C.J., MALONE and GARDNER, JJ.

PER CURIAM: Mother appeals the termination of her parental rights to her three
children—N.O., E.O., and Z.Z. Mother contends that the decision was supported by
insufficient evidence that she was an unfit parent or that termination was in the children's
best interests. The district court also terminated the parental rights of N.O. and E.O.'s
father and Z.Z.'s undetermined father. The fathers, however, do not participate in this
appeal. Because the record supports the district court's ruling, we affirm.

*Factual and Procedural History*

The State filed its child in need of care (CINC) petitions on May 23, 2016, alleging N.O., E.O., and Z.Z. were children in need of care because they were either without adequate parental care, control, or subsistence and that it was not due solely to the lack of financial means of the parents. The petition also alleged that the children were not attending school. The petition also included specific allegations of N.O.'s truancy and a date on which N.O. was left at her school without a ride home, Mother's physical abuse toward Z.Z., general accusations of neglect of all three children, and Mother's use and sale of illicit drugs.

On June 24, 2016, the district court entered an order of informal supervision with the Kansas Department for Children and Families (DCF) services and allowed the children to continue living with Mother. But after Mother tested positive for methamphetamine and marijuana on September 15, 2016, the district court granted the State's request to have the children removed from Mother's custody and placed the children in the temporary custody of DCF.

An amended CINC petition was filed in November 2016, raising new allegations against Mother regarding additional drug use, loss of employment, and domestic abuse between Mother and a male friend. The district court adjudicated the children CINC in February 2017. The district court ordered that the children remain in DCF custody with placement in DCF's discretion and adopted a proposed permanency plan with a goal of reintegration with Mother.

In December 2017, the district court held a permanency hearing and found that reintegration was no longer viable. In May 2018, the State moved to find Mother unfit and to terminate her parental rights. Although the motion listed several specific reasons

termination was appropriate, the motion focused mainly on Mother's drug use and inability to carry out a reasonable plan approved by the district court.

A three-day termination hearing was set on the State's motion to terminate. The State presented testimony from various DCF and Saint Francis Community Services (SFCS) workers, including Mother's SFCS reintegration supervisor. The State also presented testimony from N.O.'s elementary school principal to discuss N.O.'s school attendance, Mother's probation officer to discuss Mother's probation violation and subsequent revocation, and the records clerk for Seward County's Sheriff's Office to discuss criminal cases initiated against Mother during this case. N.O. and E.O.'s father testified. But Mother failed to appear on the third day of hearings and thus did not testify. But through her attorney, Mother objected to the termination of her parental rights. The guardian ad litem—Barbara Nash—recommended that Mother's rights be terminated because she had not completed her case plan requirements. Nash also argued that the children's interests would be best served through termination of Mother's parental rights because Mother was unable to care for the children and the children had been in DCF custody since 2016 and needed permanency. Prosecution noted that this case was originally filed in May 2016, an amended petition was filed in November 2016, and the children were adjudicated CINC in February 2017. The State argued that in that time, Mother consistently thwarted state agency efforts to help the family. The State also asked that the court consider the factors under K.S.A. 2019 Supp. 38-2269(b)(3)-(b)(9).

The magistrate court announced its decision from the bench. The court ultimately found that the evidence was clear and convincing that Mother was unfit by reason of conduct or condition rendering her unable to properly care for the children, and that this conduct or condition was unlikely to change in the foreseeable future. The court's finding was based in part on Mother's "excessive use of narcotics or dangerous drugs." See K.S.A. 2019 Supp. 38-2269(b)(3). The magistrate court found that reasonable efforts by childcare agencies were made to rehabilitate the family but that those efforts failed. See

K.S.A. 2019 Supp. 38-2269(b)(7). The magistrate court also found that Mother lacked effort to adjust her circumstances to meet the needs of her children, she failed to maintain regular visitation, maintain employment, obtain a home, carry out a reintegration plan, or pay any reasonable portion of costs of substitute care and maintenance of the children. See K.S.A. 2019 Supp. 38-2269(c). After considering the children's physical, mental, and emotional health needs, the court held that it was in the best interests of all three children to terminate Mother's parental rights.

Mother appealed to the district court. The district court affirmed the magistrate court's decision.

Mother timely appealed to this court.

*Legal Analysis*

Mother first challenges the sufficiency of the evidence supporting the district court's findings that she was unfit as a parent and that any unfitness was unlikely to change in the foreseeable future. See K.S.A. 2019 Supp. 38-2269(a). Then, Mother challenges the court's findings that terminating her parental rights was in her children's best interests. Because the record shows that these decisions were supported by clear and convincing evidence, we find no error and affirm the termination of Mother's parental rights.

*Standard of Review and Basic Legal Principles*

"When this court reviews a district court's termination of parental rights, we consider whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parent's right should be terminated." *In re*

4

*K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011). We do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

A parent has a constitutional right to a continuing relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y*, 286 Kan. at 697-98. Because this right is a constitutionally protected liberty interest, the State may terminate an individual's parental rights only upon clear and convincing proof of parental unfitness. K.S.A. 2019 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 Kan. P.3d 903 (2014); see *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (substantive liberty interest); *Pierce v. Society of the Sisters*, 268 U.S. 510, 534-35, 45 S. Ct. 571, 69 L. Ed. 1070 (1925) (recognizing "the liberty of parents and guardians to direct the upbringing and education of children under their control").

Once a child has been adjudicated a CINC, the district court may terminate parental rights "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2019 Supp. 38-2269(a). When considering a parent's unfitness, the district court may apply the nonexclusive list of factors in K.S.A. 2019 Supp. 38-2269(b) and when the child has been removed from the custody of the parent, the court may consider the additional factors in K.S.A. 2019 Supp. 38-2269(c). The court may also rely on any of the statutory presumptions in K.S.A. 2019 Supp. 38-2271 to establish a parent's unfitness. Any single factor may establish grounds for termination of an individual's parental rights. K.S.A. 2019 Supp. 38-2269(f).

When determining whether a parent is unlikely to change in the foreseeable future, courts use "child time" as the measure. Children experience the passage of time in a way

that makes a month or a year seem considerably longer than it would be for an adult, thus this difference in perception drives courts toward a prompt decision to establish permanence for the children involved. K.S.A. 2019 Supp. 38-2201(b)(4); *In re M.B.* 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008).

*Sufficient Evidence Supports the Decision to Terminate Mother's Parental Rights.*

Mother addresses each of the case plan tasks that she was required to complete before reintegration. She argues that she completed or nearly completed all the tasks assigned. Mother also argues that the State agencies failed to make reasonable efforts to reintegrate the children with her, implying that the agencies impeded completion of some of the case plan tasks. We address each of the tasks listed in Mother's case plan and find that clear and convincing evidence supports the district court's determination that Mother was unfit and that unfitness was unlikely to change in the foreseeable future.

1. *Drug and Alcohol Evaluation and Completion of Recommendations*

The first task listed in Mother's case plan required that Mother complete a drug and alcohol evaluation with an approved provider and follow all recommendation from that evaluation. Mother was also required to sign a release for SFCS to obtain a copy of the recommendations. Mother argues that she completed several drug and alcohol evaluations—including one in May 2018. Mother also argues that the requirement that she follow all recommendations was "unreasonable" because although she attended outpatient treatment at one facility, she was later told that she could no longer go to that facility and would need to go to a different location. But the record shows that Mother did not follow the recommendations of her evaluations and thus did very little to complete even a portion of this case plan task. And although the record is unclear as to why Mother was required to choose a different outpatient treatment location, Mother fails to establish why such a requirement would prohibit her from completing this task.

6

DCF worker—Angela Hernandez—first contacted Mother in April 2015. Hernandez testified at the termination hearing and explained that when Mother gave birth to her youngest child (Z.Z.), Mother tested positive for both methamphetamine and marijuana. And Mother admitted to using drugs with her uncle. Because Mother was willing to be enrolled in inpatient treatment at that time, the State did not take any further corrective action regarding her drug use. And Mother completed that inpatient treatment. But Megan Baker—Mother's SFCS reintegration supervisor—testified that Mother later continuously thwarted efforts regarding drug treatment. Baker testified that although efforts were made to have Mother complete substance abuse treatment in 2015 and in-home family preservation services were twice implemented, Mother continued to test positive for drug use. As a result of her continued drug use, SFCS's recommended plan changed from informal supervision to out of home placement.

Melinda O'Hair—SFCS social worker and licensed therapist—first met Mother on June 27, 2016, not long before the children were removed from Mother's home. O'Hair had weekly meetings with Mother throughout the summer. During those meetings, Mother admitted on August 22, 2016, September 13, 2016, and September 15, 2016, to using methamphetamine and marijuana. Mother also admitted that she had previously used drugs when the children were present. O'Hair reported Mother's use of drugs in front of the children to DCF. O'Hair also referred Mother to drug and alcohol counseling. But the children were removed from Mother's home on September 15, 2016, and as a result, O'Hair no longer worked with Mother. Instead, reintegration services took over her responsibilities.

Although the State presented evidence that Mother completed several drug and alcohol assessments, Baker testified that Mother refused one assessment because she felt the woman conducting the assessment asked too personal of questions. Mother refused to complete another evaluation until it was court ordered. Baker also testified that the case plan task regarding drug and alcohol use was not completed because Mother did not

7

follow the recommendations of her partially completed evaluations. In this regard, Mother also continued to use drugs and failed to provide evidence that she attended and completed any outpatient treatment—including the level 1 outpatient treatment recommended after an assessment in February 2017. Mother was also unsuccessfully discharged from a drug and alcohol program. And although Mother promised in a district court hearing that she would go to a women's recovery center in Wichita, she did not. Mother failed to go to the Wichita center even after SFCS put fuel in her vehicle for that purpose. And although Baker testified that Mother apparently attended some "therapeutic counseling, . . . due to some events that took place, she needed to go to a different location[,]" the record does not show that Mother was somehow prohibited from attending at a different location or that that "therapeutic counseling" was sufficient to satisfy the requirements of this case plan task.

As evidenced by Baker's records and account of events, Mother failed to complete treatment for the drug and alcohol recommendations she received.

2. *Mental Health Assessment and Completion of Recommendations*

Next, Mother was required to complete a mental health intake appointment with an approved provider and follow all recommendations. She was also required to sign a release for SFCS to obtain a copy of the treatment plan.

Mother maintains that she completed this task. Mother asserts that she attended therapy on October 10, 2017, November 7, 2017, and January 10, 2018. According to Mother, her therapist set a target date of December 15, 2017, to complete this goal. Mother thus argues that because she attended therapy on these dates, she completed this case plan task. But the therapy target date is not supported by the record and is not dispositive of the issue of whether Mother fully completed this case plan task. Mother also notes that Baker admitted she had not spoken with Mother's therapist. Yet this fact is

8

immaterial because it does not negate the evidence against Mother with regard to this task.

The record shows that Mother completed a mental health intake assessment and signed a release to of the treatment plan to SFCS. But Baker testified that Mother did not attend mental health services as recommended. Thus Mother failed to complete this task. Baker specified that although Mother began therapy, she stopped going. And because Mother had not attended scheduled visits with her therapist, she had seemingly not been successfully released from the therapy services. So although Baker conceded that she had not spoken to Mother's therapist directly, Mother's failure to attend scheduled therapy visits in conjunction with her release from services indicated that she was not released because the services were successfully completed.

The record shows that Mother attended individual therapy sessions on October 10, 2017, and November 7, 2017. But the record does not show that Mother attended a therapy session on January 10, 2018, as she claims. Instead, January 10, 2018, is listed as the date the treatment plan was made. That treatment plan then lists December 15, 2017, as the target date for Mother to "[t]alk through some parenting issues." While December 15, 2017, was seemingly a typographical error because it preceded the date the treatment plan was made, the date does not necessarily indicate that all of the recommendations stemming from Mother's mental health intake screening were completed. Instead, Baker's testimony sufficiently established that Mother did not complete the requirements of the mental health case plan task.

3. *Obtaining and Maintaining Suitable Housing*

Mother was also required to obtain and maintain housing approved by SFCS with "appropriate sleeping arrangements, working utilities (i.e. gas, electric, and water), safe for children under age 3 following the SFCS home health and safety checklist." Although

9

it is unclear, Mother seemingly blames SFCS for her failure to complete this task while also asserting that she completed the task.

The record clearly shows that Mother has never obtained and maintained approved housing. In this regard, the record shows that Mother jumped from home to home, sometimes moving into housing unsuitable for children, and may have been without housing at times.

SFCS was able to compile a list of addresses that Mother either reported or that SFCS learned about by other means. For roughly six months, Mother had a single address but was eventually evicted from that home. At times, Mother did not give an address because she was in jail. Specifically, Mother served one jail term from December 5 to December 21, 2017. Her second stint of incarceration lasted from June 26, 2017 to August 17, 2017. On other occasions, Mother either failed or refused to give SFCS an address. On August 18, 2017, Mother notified SFCS of an address—seemingly without issue. In February 2018, Mother falsely reported that she was living at a women's recovery center in Wichita. Later that same month, Mother reported that she was living with her grandmother in Hugoton. In June 2018, Mother was reportedly living in a small camper without electricity. An SFCS worker—Elena Gomez—described the camper as a "truck bed camper" that lacked electricity or utilities. This assessment was admittedly made without looking inside of the camper. But even without seeing inside the camper, Gomez testified the camper was not an appropriate living space for three children.

Baker testified that because a walk-through of Mother's housing never occurred, none of the addresses she reported were approved as being suitable for the children. In this regard, Baker testified that although she and Mother talked about doing a walk-through on more than one occasion, a walk-through was never completed. When a walk-through was attempted, Mother's roommates were not present and did not give verbal

approval to allow inspection of their rooms. So Baker felt uncomfortable completing the inspection.

Additionally, Mother reportedly lived in a home with her uncle and father for several months and would use them as childcare. Mother admitted to using drugs with her uncle and also reported to Hernandez that her father had sexually abused her when she was nine years old. Similarly, after Mother was released from the inpatient treatment she completed after testing positive for drugs when she gave birth to Z.Z., she lived with a friend who was later accused of physically abusing the children.

This evidence was sufficient to establish that Mother did not complete the suitable housing case plan task assigned to her.

### 4. *Completion of KBI/CANIS Checks*

Mother was required to ensure that anyone who was 10 years old or older and living with Mother submitted to Kansas Bureau of Investigation (KBI), Child Abuse and Neglect Information System (CANIS), and other necessary checks, and secure approval of those people with SFCS. Mother asserts that because she lived alone at the time of her termination hearing, this requirement was necessarily met.

First, it is unclear whether Mother lived alone at the time of the termination hearing. Baker testified that Mother referred to the people living in the trailer home next to her camper as "roommates." Mother did not testify and thus never gave clarity on the matter. Regardless, Baker testified that this case plan task was never completed. According to the case plan, it was required that anyone living with Mother who met the criteria needed to be checked and approved. Nothing in the record suggests that Mother's father, uncle, grandmother, friends, or any other person identified as having lived with Mother ever received the necessary approval.

11

Also, the State correctly points out that the completion of this goal is likely a non-issue because Mother never got past supervised visits with the children, so the children were never allowed interaction with those living with Mother and would not have been left in their care.

### 5.  *Submission to Random Drug Testing*

Another case plan task required that Mother submit to random urinalyses (UA's) and mouth swab tests when requested. If she tested positive, a new drug and alcohol evaluation was scheduled within seven days. Mother argues that she completed this task because every time she submitted to a drug test, the task was complete. She also makes a conclusory assertion that the drug testing results were inadmissible at her termination hearing. Mother, however, only incidentally raises this issue and fails to support her argument with any pertinent authority. So it is waived. See *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017) (points raised incidentally); *In re Adoption of T.M.M.H.*, 307 Kan. 902, 912, 416 P.3d 999 (2018) (failure to cite supporting authority). And the record shows that Mother either refused to take or failed the random drug tests on multiple occasions.

Mother either refused or did not attend scheduled testing 21 different times. On March 13, 2017, Mother refused to take a UA but admitted to using marijuana. Mother tested negative for drugs on January 3, 2018, but tested positive for amphetamines and methamphetamines on October 12, 2016, October 28, 2016, November 8, 2016, and January 25, 2017. Because negative drug test results were a prerequisite to visitation with the children, Mother's visitation rights were also inhibited by her drug use. Based on this evidence, the district court reasonably found that Mother failed to complete this case plan task.

### 6. *Maintain Stable Employment*

Mother was required to maintain stable employment and provide check stubs when requested. The record sufficiently establishes that this task was never completed.

Before March 2018, SFCS received no information regarding Mother's employment. Then on March 22, 2018, Mother told SFCS that she was employed at a place that paid only cash. In this regard, Baker testified that Mother submitted a single pay stub and a letter indicating that Mother worked for a place named "Parnell and Sons." But Mother stopped working there on April 20, 2018. Mother also gave some indication that she was performing side jobs in June and September 2018 but did not provide verification.

Mother emphasizes that she did not have a license or a social security card, which could make it more difficult to find full-time employment. Baker testified that she knew Mother was working to get a driver's license or a social security card. And although Baker acknowledged that SFCS did not assist Mother in obtaining those, the only way SFCS could have aided Mother in that task would be to get her a phone to call to request these documents. But Mother did not request a phone. So while it is likely true that Mother had a difficult time finding full-time employment without this documentation, her ability was not hindered by any failure on the part of SFCS.

### 7. *Refrain from Behaviors that Result in Incarceration*

The seventh task in Mother's case plan required that Mother refrain from behaviors that result in incarceration, making her unavailable to care for her children. Mother argues that this task was completed each day she was not incarcerated and notes that she has not been incarcerated for over a year. While Mother's assertion is accurate, the record shows that Mother was jailed on three different occasions during the pendency of this

case. Specifically, Mother spent time incarcerated on May 4, 2017, June 26, 2017 to August 17, 2017, and December 5 through December 21, 2017. The district court did not err in considering Mother's incarceration in determining that she did not comply with the case plan.

8. *Complete an Approved Parenting Class*

Mother was required to attend an approved parenting class with a minimum of six hours and provide SFCS with a copy of the certificate. Mother argues that she completed this task because she attended more than six hours of parenting classes and provided proof to SFCS. Specifically, Mother asserts that she completed five hours of a parenting class with SFCS and three and one-half hours of parenting classes with another provider. But the State still presented evidence that Mother did not complete this task as specified in her plan.

Baker testified that Mother attended several parenting classes but not the full six hours required under the plan. Baker also testified that Mother did not complete a parenting class provided by SFCS and did not complete the class she attended and thus did not earn a certificate of completion. Baker explained that the classes provided by another agency were not an approved means of completing this task and that the hours do not accrue. Instead, Mother was required to complete a six-hour class and receive the certificate of completion for that class. Because she did not, she did not complete this task.

9. *Inform SFCS of Changes and Progress*

Mother was also required to contact SFCS biweekly to inform them of any changes in her contact information and to report her progress. Baker testified that because

SFCS did not know where Mother was on several occasions, she did not complete this task.

10. *Notify SFCS of Changes in Contact Information*

Mother was tasked with notifying SFCS of any changes to her contact information, address, or employment within 48 hours. As evidenced by the testimony regarding an inability to contact Mother or determine where she lived, it appears that Mother did not comply with this task. And although Baker testified that this is an ongoing task, she also explained that Mother sometimes failed to comply with this requirement.

11. *Attend Scheduled Meetings*

Mother was required to attend all scheduled meeting with SFCS, courts, attorneys, schools, and others. Mother asserts that she completed this task because she attended "every court hearing since the beginning of th[is] case" and because she attended multiple SFCS meetings. But the record shows that Mother missed more than 19 scheduled meetings with SFCS, one being her initial case planning conference. Mother also failed to appear at the final day of the termination proceedings and thus lost the opportunity to testify. Because she missed multiple appointments, Mother did not complete this task.

12. *Have an Approved Plan for Child Supervision*

Mother was required to have an approved plan for supervision of her children while she was away from them. This plan included the requirement of KBI/CANIS checks and any other check necessary for those who have lived outside of Kansas within the last year for anyone in Mother's household. This task was not completed because Mother never got past supervised visitation, so this task was never worked on. In this regard, Baker testified that Mother could be "very erratic at times" and that supervision was required to ensure the children's safety. So although it would be somewhat premature

15

to find that Mother did not complete this task, such a finding is immaterial as it has already been established that Mother failed to carry out a reasonable case plan by failing to complete or substantially comply with the majority of the tasks in her case plan.

*Remaining Visitation Concern*

As a final point, Mother asserts that SFCS suspended visits with her children on September 11, 2017. Although Mother raises this claim, she simply lists facts and does not make any legal argument. So it is unclear what recourse Mother requests with regard to this issue.

Still, SFCS was not at fault for Mother's failure to progress from supervised visits to unsupervised visits and, ultimately, to reunification with her children. Gomez testified regarding Mother's supervised visits. She testified that she began supervising visits in February 2017. During that time, Mother failed to confirm five visits. She failed to show up to one visit and showed up too late for another visitation. Mother failed to take a UA before 11 visits, so visitation was not allowed. Three visits were cancelled because Mother was in jail. On September 18, 2017, E.O. was not transported to the visit with Mother because the driver who was supposed to transport E.O. to the visit refused to do so—the driver was concerned for the other children's safety in the vehicle because of E.O.'s screaming, crying, and other physical behavior. Visits were canceled from February to March 2018, but Gomez was unable to say why.

Again, Baker testified that Mother could be "very erratic at times" and that supervision during visits was required to ensure the children's safety. Mother's erratic behavior caused her daughters to become upset—"crying hysterically in the vehicle and not comfortable." One such instance occurred during a supervised visit in a park on September 11, 2017. There, two of the children became upset, telling the SFCS workers that they needed to call the cops on them because they took them away from their

Mother. The workers, assuming Mother told the children they needed to call the police, told Mother it was inappropriate to tell the children that. But Mother also became upset, demanding that the children be present while talking about the case. This event resulted in a recommendation to temporarily suspend visits.

Baker testified that on September 19, 2017, SFCS received a recommendation by their therapist to stop visitation between Mother and N.O. and E.O. But visits were allowed to resume on January 25, 2018. In August 2018, N.O. told her therapist that she no longer wanted to attend visits with Mother. And by the date of the second termination hearing, Mother had not had a visit with her children since August 15, 2018.

The State's evidence shows that Mother's inability to progress from supervised visitation to unsurprised was her own fault and not the result of SFCS's actions, as suggested in Mother's brief. A district court may terminate a parent's rights to his or her child if clear and convincing evidence shows the "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family." K.S.A. 2019 Supp. 38-2269(b)(7). The magistrate court's holding that reasonable efforts failed was supported by sufficient evidence.

Likewise, the district court's ultimate decision was supported by clear and convincing evidence. The record shows that Mother failed to carry out a reasonable plan approved by the court directed at reintegration of the children into Mother's home. See K.S.A. 2019 Supp. 38-2269(c)(3). The minimal progress of Mother's reintegration also supports the district court's decision that Mother's conduct was unlikely to change in the foreseeable future. Notably, Mother even failed to appear on the last day of the termination hearings, further supporting the notion that she is not amenable to change.

*Best interests of the children*

Having found unfitness, a district court must then determine whether termination of parental rights is in the "best interests of the child." See K.S.A. 2019 Supp. 38-2269(g)(1). In making a best interests finding, the district court "shall give primary consideration to the physical, mental[,] and emotional health of the child." K.S.A. 2019 Supp. 38-2269(g)(1). The district court makes this decision based on a preponderance of the evidence. And the decision rests in the sound discretion of the district court. See *In re R.S.*, 50 Kan. App. 2d at 1115-16. So we review those decisions for an abuse of discretion. A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

Mother makes a conclusory argument that the district court's decision regarding the children's best interest was based on zero evidence, without providing this court with any factual basis to support her claim. Issues not adequately briefed are deemed waived or abandoned. *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018). Likewise, a point raised incidentally in a brief and not argued therein is also deemed abandoned. *May*, 306 Kan. at 1089. Accordingly, Mother fails to show how the district court abused its discretion in making the best interests finding. Additionally, Mother's argument is contrary to the evidence presented at the termination hearings.

The record supports the district court's best interest finding. By the time of the termination hearings, the children had been in an out-of-home placement for over two years. After being placed with their foster family—whom the children spent the majority of those two years with—the children's grades and school attendance improved. The

18

district court agreed with Baker's testimony that "[t]he girls need permanency to be able to . . . know where they're going to be in their future and feel settled." We find no abuse of discretion in that finding, or in the district court's conclusion that termination was in the best interest of the children.

The district court did not err in terminating Mother's parental rights. Any single factor could have established the grounds for terminating Mother's parental rights. See K.S.A. 2019 Supp. 38-2269(f). After viewing the evidence in the light most favorable to the State, we are persuaded clear and convincing evidence supports the decision to terminate Mother's parental rights.

Affirmed.